Good morning ladies and gentlemen. Our first case for argument this morning is Philadelphia Indemnity Insurance Company against the Chicago Trust Company. Mr. Good morning, your honors. May it please the court, my name is Tony Carrozza. I'm here on behalf of the Chicago Trust as administrator for the estate of Kiana Rudisill. We're here today to talk about the coverage applicable for certain bodily injury suffered by Kiana over the course of two policy periods. It was physical abuse that ultimately ended in her wrongful death during the second policy period. This abuse spanned the course of several months, triggering coverage for policies of insurance issued by Philadelphia Insurance Company to the baby fold who was alleged negative. Mr. Carrozza, I have a problem here. And the problem can be summed up in the question, what are you appealing from? The district court's dismissal of our counterclaims seeking a determination of coverage and the district court's determination of the applicable limits of coverage available. And how was the, how did the court determine those limits? The court applied and I'm asking, I don't think you're catching on. The court issued an opinion that seemed quite favorable to the insurer. Then it issued a judgment which says the case is dismissed. There was, the court said the insurer's entitled to a declaratory judgment and it didn't enter one. In fact, it seemed to have entered a judgment in favor of your client. That's why I'm asking what you're appealing from and of course I will be asking how we can be considering the propriety of a declaratory judgment when none was ever entered. I appreciate that, your honor. The district court did award coverage, a finding of coverage- No, it did not. It wrote an opinion. But the judgment doesn't match the opinion, right? The appeal is from the judgment. The opinion explains the judgment. Unfortunately, in this case, the opinion and the judgment are mutually contradictory. That's a problem. I agree, your honor. And part of the- Anybody ask the district court to enter a proper judgment in this case? No, your honor. Perhaps you need to do that. I can certainly consider that. We have said, I think pretty much until blue in the face, that if the district judge says that somebody is entitled to an injunction or a declaratory judgment, one must be entered before there can be an appeal. We've said that over and over. The judge said there was an entitlement to a declaratory judgment, then entered a judgment that was the opposite of that, and nobody paid any attention. So we've got an appeal, but probably no appellate jurisdiction. I apologize for that, your honor. I took the court's dismissal of the case in its entirety with prejudice in conjunction with that finding under the opinion and order of a finding of coverage- You can't take anything in conjunction with an opinion. The judgment is what it is. And I believe that opinion was couched- We've said, I can't count how many times we've said, a judgment must provide the relief to which the prevailing party is entitled. This doesn't. In fact, it even names the wrong prevailing party. We can rectify that, your honor. Well, the district judge can rectify that. It would have been a lot better had somebody pointed out to the district judge that there was a serious problem in this case. I now agree, your honor. I apologize. But this appeal isn't going anywhere until there's an appealable judgment. Now, if you want to proceed, this is going to be your only chance. But unless the district court does something, we have no jurisdiction. Not of your appeal. We would have jurisdiction of an appeal by the insurer who asked for a declaratory judgment and didn't get it. Okay, your honor. Since your court invited me, may I argue the- Please. Thank you, your honor. So, what is at issue is, assuming the appeal goes forward and we have the district court correct the order and the judgment, is the applicable limits of access coverage available under policies of insurance issued by Philadelphia. Two baby fold. Our contention, and we believe that the court misinterpreted the application of a policy sublimit endorsement in the access policies. What the district court did is read that policy endorsement into the access policies and change the access policies completely. Taking the $5 million in available coverage and reducing that to $250,000, absent clear and explicit language. The specific endorsement that's at issue is document number 1-5. Since there's two policies of insurance that are consecutive policies, there's two separate records. One is document 45-4, one is document 1-5, number 413. 45-4, number 1019. It's a single coverage form, a single spam, otherwise known as a sexual or physical abuse or molestation liability coverage form sublimit. What the court determined was that the sublimit, which provides abuse of conduct coverage for $250,000, changed the access policy as a whole from $5 million policy to a $250,000 policy. I thought she just said it limited it. And that seems to be exactly what it does just by its plain terms. That is the district court's interpretation of Philadelphia's arguments, your honor. However, what it's titled is a sexual or physical abuse or molestation liability coverage form sublimit, not an access policy sublimit. What the sexual- Do you contest that it's within, it's part of the access policy? In other words, it's not, these provisions do not appear in the primary policy, they appear in the access policy. The provisions are included within the access policy, and the access policy is meant to include a specific coverage form that comes from the underlying insurance. And that coverage form is document 1-4, 398 through 402, and 45-3, page numbers 999 through 1003. That form from the underlying insurance has its own declarations page, which is 45-3, number 777, then 1-4, 165, that provides a $1 million coverage limit for an underlying layer of insurance. That's a separate coverage form within the underlying layer of coverage for primary policies. It provides $1 million in coverage. The spam sublimit endorsement limits that $1 million in coverage- Right, in the primary policy. $250,000. Right, but here we're talking about the access policy. Right, and so that spam form sublimit provides that the access policy is meant to include that coverage form, but not for the $1 million policy limits otherwise available, only for $250,000. No, not for the million, for the $5 million. Reduces the $5 million to $250,000. Because the access policy by its terms provides a max of up to $5 million, correct? Correct. And so all this is doing is it says this endorsement changes the policy, the policy is the access policy, and then it has this, I think it's just a term of art, this sublimit that limits the $5 million down to $250,000. That's the interpretation we think is erroneous, Your Honor, though. Right, I guess the difficulty that I have is just looking at the language and the structure of this, why is that the case? Right, I agree, and that's what the district court said, it must mean something. We have this sublimit endorsement here, what does it mean? It must mean something, it must mean it reduces the limits of the access policy, but it doesn't. By its very terms and by its very title, it reduces the coverage available under the form, which is $1 million under the declarations of the spam coverage form. That's not the same as explicitly, clearly, or unambiguously saying that the declarations, the insuring agreement, the limits available under the access policies are limited by this sublimit. How do you get there from the language? Just looking at the language, I mean, I hear what you, I understand what you're saying, but when I look at the words, I think how in the world do you get there? It's the absence of the language, I think, is the issue, Your Honor, is that you can't take a $5 million policy under Illinois law and rules of construction, and reduce it to $250,000 absent clear, explicit, unambiguous language. This doesn't say that the limits available under the declarations or that the access policy limits are subject to, reduced by, limited by this sublimit endorsement. It merely says the limits are included within and not excess of, nor in addition to. That's not the same as saying it completely changes the $5 million limits and reduces it to $250,000. If they wanted to do that, they could have labeled this an access policy sublimit. It could have said that the declarations and the access policy are hereby limited, subject to, or reduced by, which is a lot of the language in the Formosa case, in the Baylor cases that they discussed on how the sublimits are applied. But the sublimit is restricted to the spam form coverage that is otherwise available, not the access policies insuring agreement that cover bodily injury occurring during the policy period up to limits of $5 million. The form specifically also provides all other terms and conditions of this policy remain unchanged. That's the declarations, that's the limits, that's the insuring agreement, that's the policy periods that would otherwise apply. There's no clear and explicit language in this sublimit endorsement that changes those clear terms of the access policies clearly or unambiguously. I understand the operation of what a sublimit would do and I understand how it's supposed to be read, but that's not how this specific coverage form operates under the language that's set forth here. Again, I understand what they're trying to do and what it's supposed to mean, but the clear and explicit language doesn't say that and this endorsement doesn't mean that. It's a sublimit for the spam form coverage that is $1 million and the access policy is a separate policy that operates to cover bodily injury occurring during the policy period. The ambiguity is further clear in their arguments is that the spam form sublimit, it can't do both. It can't be both the sublimit for the $50,000 sublimit for the access policies. It says the limits included in the limits of insurance statement declarations. There's two sets of declarations. The spam form includes its own declarations. The access policy includes its own declarations and again, all other terms and conditions are supposed to be unchanged. So at best it's ambiguous and at best Philadelphia is trying to capitalize on certain ambiguities, which they can't do under Illinois law either. I have a little bit of time. I'll save for rebuttal. Thank you. Certainly counsel. Mr. Ehlers. David Grassman Carter. Not Mr. Ehlers. Mr. Ehlers is my colleague. You informed the clerk's office that Mr. Ehlers would deliver the oral argument. Your Honor, we informed him that David Grassman would deliver the oral argument. Mr. Rasmussen, please proceed. May it please the court. My name is David Grassman. I'm with the law firm of Cope Ehlers, representing Philadelphia Indemnity Insurance Company. My partner, Dirk Ehlers, is at the council table and he's here with me on the brief. I assume you can tell what my first question is going to be, which is why are we here? Well, because as we understood it, Your Honor, and as the jurisdictional statements submitted by Chicago Trust stated, they were appealing a dismissal of the case below. And we were responding to the appeal of a dismissal from the case below. And in that sense, the posture of the case is just appeal from an entry of dismissal. And then why is there an appealable judgment? On your view, the case remains pending in the district court because it has never finally resolved your claim. And unfortunately, you can't appeal from the resolution of a counterclaim if the main claim remains pending. The court dismissed the whole case, Your Honor, and they closed the case. It was entered closed on the docket. And so in the view of the court below, the case went away. What the judgment says is the judgment is entered for the defendant. It actually doesn't even mention that there are two defendants. It doesn't mention Chicago Trust. That's an independent problem. It has to resolve all claims of all parties. The judgment doesn't recognize that there's a counterclaim. The district judge said that your client was entitled to a declaratory judgment and then didn't enter one. You're correct, Your Honor. So the case is not over. Except the district judge closed the case. The judge entered the order dismissed and ended it on the docket, said this case is closed. So what do you think the posture is? You've asked for a declaratory judgment and didn't get one. What are the party's legal rights? I think at this stage, Your Honor, the proper remedy for the court here would be to enter an order saying you lack jurisdiction and remand it for the district court. I think that's a very likely thing to happen. But your brief doesn't make any jurisdictional objection. You're correct, Your Honor. We didn't make that jurisdictional objection. Did you ask the district court to enter a proper judgment resolving all the claims by all the parties? We did not, Your Honor. Life would be easier if district judges did the right thing spontaneously, but it would also be easier if the parties, when they notice a mistake, ask the district court to finish the job. You're right, Your Honor. You shouldn't wait till oral argument in the court of appeals. You're right, Your Honor. I agree with you completely. Should I continue with argument on the limits, Your Honor, or would the court just prefer to resolve this? This will be your only chance. Well, then I'll continue. If the district court fixes this, it will be submitted on this argument. Okay. Then, Your Honor, I think what's fair to say is Philadelphia and Chicago Trust don't disagree on Illinois insurance law. There's complete agreement about parties about how Illinois insurance law should be understood and interpreted. The disagreement has to do with what policy limits are set by the policies at issue here, and this is a case where the factual background makes some difference. There are two policy periods, 2010-2011. For each policy period, there are two policies of insurance. There's a commercial lines policy, which is the underlying policy of insurance, and there's an excess policy, and the excess policy is access to the commercial lines policy. The commercial lines policy contains a number of what are called policy forms, and that's described on the declarations page, and there are several at issue that could have provided coverage for abusive conduct. There's a CGL policy, or commercial general liability policy. There's a professional liability policy, and there's called the SPAM form, the sexual, physical abuse, and molestation form. Each of those are policy forms in the underlying policy. In the CGL policy, in the underlying policy, and in the professional liability policy, in the underlying policy, both expressly contain an exclusion, saying they don't cover physical abuse. In the underlying policy of insurance, just the SPAM form covers physical abuse. What's important to note here is there's no disagreement about the parties and how the underlying policy works. We noted in footnote three of our brief, there's an exclusion form in the underlying commercial liability policy, and we thought that was important enough to quote that form in its entirety, because that endorsement to the CGL policy says it creates an exclusion, or it creates a sublimit. It has either option, and then we show in the footnote there's things blank and blank, because in the CGL policy below, it doesn't create a sublimit. Not one from Chicago Trust or the Baby Fold has ever contended there's an ambiguity with the endorsement in the underlying CGL policy. They've all agreed that in the underlying commercial lines policy, there's a million dollars of insurance for abusive conduct, and that's with the language of the endorsements included. Now the excess policy is structured in the same way as every other Philadelphia policy. It has a declarations page. It then has a page where it lists the other forms that comprise the policy. Insurance policies look complex, but they're very simple to read, because they tell you how to read them, because they give you a declarations page telling you what's covered. They then give you a list of forms that are included, and this is what we described in our brief about the excess policy. Then they include an insuring agreement, and they include the endorsements. In this case, the excess policy worked and provided coverage under coverage A or coverage B, and what the excess policy said is if there's an underlying limit of insurance, this policy will act as an excess to whatever that insurance is, and then it had a list of forms saying these are the forms below for which we provide insurance, and physically I can show you what that list looks like. It looks like this, and it's included in the electronic exhibits in the supporting record. We cite to it in the brief, and it just lists the underlying insurance, and because in this case there's a million dollars of underlying insurance, the excess policy provides excess insurance. That's what the essence of this dispute is about. What is the amount of excess insurance provided by the policy? That's contained in the spam endorsement to the excess policy. The spam endorsement in the excess policy is the whole point that's at issue. Now, an endorsement modifies an insurance policy. There's no dispute under Illinois law that that's what happens. You have an endorsement, and it tells you the modification, and in this case, as we go through it and explain in the brief, the first line of the endorsement says this endorsement modifies the insurance provided under the following. There's no ambiguity there. It says this is modifying the policy, and then it says it modifies the commercial excess liability policy. It doesn't say it modifies the spam form. It doesn't say it modifies the CGL policy. It doesn't say that it modifies anything else. It says it modifies the modification. Then it goes on and says this policy, meaning the commercial excess policy, is intended to include the spam form, but it's only intended to include the spam form with the limit that's described below, and it describes this doesn't mean we're adding insurance. It doesn't mean we're taking insurance away. It means we're setting a sublimit, and it uses the word sublimit to say we're going to give spam coverage for the amount of the sublimit. Now, in the briefing, Chicago Trustees talked about the fact that Philadelphia didn't use the word exclusion. It didn't use the word follows form. It didn't do any of those things, and of course it didn't do any of those things because oops, that's not what the spam form does. The spam form and the spam endorsement is a carve-in that makes it express that there will be coverage for abusive conduct in the excess policy, but only in the amount of $250,000, and that couldn't be clearer from the language of the policy. Mr. Grassman, what's the purpose of the first part of the sentence you just read? Why is that in there? The policy is intended to include the spam coverage form because it's not a follows form endorsement, Your Honor. It doesn't exactly follow the form of the sublimit or of the spam form. It includes the spam form, and it wants to make clear that it's creating a sublimit, and that it's going to... So does it include the spam form for purposes of dealing with things like multiple allegations of multiple injuries during the time period, the other condition about one policy applies, not two policies? Yes, Your Honor. That's exactly right, because Chicago Trust didn't really talk about it much here, but we have a fight about the anti-stacking provision, and the anti-stacking provision is included in the spam form. There's also the famous Condition 8. Condition 8 is something that's been very important to courts that have looked at the anti-stacking provision, because Condition 8 describes in the first part of Condition 8 that the intention by Philadelphia is only to provide one policy of insurance, and so if there's multiple forms that could provide insurance, only the insurance policy that provides the highest insurance will apply, except... And the last paragraph of Condition 8 is very important, because the last paragraph says that if a policy of insurance is acting as an excess policy, a pure excess policy, it can also provide insurance, which means structurally in this case, Babyfold purchased Commercial Lines policy with a million dollars of insurance, and then it purchased excess coverage, and the Condition 8 language indicates the excess coverage can actually act as excess coverage, and it can provide additional coverage beyond the Commercial Lines policy, and so in terms of the structure of the policy, the structural pieces are very, very clear. They operate together to give the Babyfold a clear limit and understanding of the abusive conduct coverage. So that opening language of that sentence is really just to incorporate by reference in a form of kind of shorthand all of those other terms and conditions rather than reprinting them in full. That's correct, Your Honor. It's exactly that way, and it's designed so that it repeats the exact language. You can conceive of circumstances where the parties wouldn't want to incorporate that language, and the hypothetical I would use is if in the underlying CGL form, they had purchased a sublimit of abusive conduct insurance, and they didn't purchase the spam form for the underlying insurance, that would mean you wouldn't include this endorsement in the excess policy because you wouldn't purchase excess insurance for your abusive conduct. Instead, you would include an endorsement in the excess policy that excluded coverage for abusive conduct because you would have chosen to purchase in the first instance less than a million dollars of abusive conduct insurance in your underlying form. So the beauty of endorsements for insurance policies is on face they seem confusing, but in fact they allow the parties to negotiate a very specific set of coverage terms that become changeable by including or removing endorsements based upon what the insured chooses to purchase. And in this case, a sophisticated consumer, the baby fold, purchased a very sophisticated form of insurance. Abusive conduct coverage is expensive. They're a human services agency. They need that coverage. It's essential. And the policy forms allowed the baby fold to negotiate a very specific level of coverage that they could afford. And that's the key. They could afford that coverage. Yeah, to sort of wrap up the position that we've taken, that the policy limit through the endorsement in the excess policy doesn't provide any ambiguity. And read in the whole and read in conjunction with the underlying policy of insurance, it becomes very clear that the parties were allocating risk and the parties agreed upon a level of coverage for abusive conduct that was affordable for the baby fold. The second piece that's also clear is that the anti-stacking provision in the spam form is when abusive conduct occurs regardless of the number of occurrences of abusive conduct and regardless of the policy periods in which it occurs. Judge Lefkoe's opinion on this point was spot on. It doesn't matter if you have coverage under the 2010 policy or if you have coverage under the 2011 policy. The one abusive conduct language means the limit of insurance will be the limit of one policy. And in this case, for the underlying commercial lines policy, that limit will be a million dollars. For the excess policy, that limit will be $250,000. In one sense here, Chicago Trust has been trolling for ambiguity because they can't explain what the endorsement in the excess policy does if it doesn't set a sublimit. I mean, the language plainly doesn't create additional coverage. The language clearly doesn't create a separate insuring agreement. The language clearly doesn't do anything different with abusive conduct other than carve out a specific guarantee of $250,000 of excess coverage. Read in terms of Condition 8, where the intention is to provide a single policy of coverage unless it's acting as excess, it's clear that the $250,000 sublimit in the excess policy is designed purely to provide additional excess coverage in a quite limited amount based upon the negotiated results sought by the parties. Thank you, Your Honors. Thank you, Counsel. Anything further, Mr. Carozza? Thank you, Your Honor. Just briefly, I'll try and be as quick as possible. The inclusion of a coverage form is not the same as limiting or making that excess policy subject to or limited by that coverage form. It is the inclusion of an additional coverage form. There's 60, 90 pages of briefing on a term that's supposed to be clear and unambiguous. It's not clear and unambiguous. It's subject to differing interpretations because of the word inclusion of a coverage form in the absence of limiting or extinguishing language. Those ambiguities are construed against Philadelphia. This is not a clear and ambiguous restriction of $5 million of coverage for an excess policy that provides a very clear and explicit insuring agreement that provides up to $5 million of coverage for bodily injury occurring during the policy period that's at issue. As far as the anti-stacking goes in the application of two policy periods, by that same argument, that spam form does not similarly limit the insuring agreement on the excess policies that provide coverage for bodily injury during the two consecutive policy periods. It is the inclusion of a separate form meant to include an additional coverage form, not a limitation, not a subject to, not a limit on the otherwise available policy limits. I thank you, Your Honors. Thank you very much. We will issue an appropriate order prescribing what needs to happen next in this case.